THIS OPINION
IS NOT A PRECEDENT OF
THE TTAB

Hearing Date: July 11, 2017          Mailed: December 28, 2017

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*Destileria Serralles, Inc.*
*v.*
*Kabushiki Kaisha Donq d/b/a Donq Co., Ltd.*

_____

Opposition No. 91204129

_____

Deborah K. Squiers and Richard Mandel of Cowan Liebowitz & Latman PC
 for Destileria Serralles, Inc.

Keith Toms and Amy J. Tindell of McCarter English LLP
 for Kabushiki Kaisha Donq d/b/a Donq Co., Ltd.

_____

Before Quinn, Lykos and Pologeorgis,
 Administrative Trademark Judges.

Opinion by Pologeorgis, Administrative Trademark Judge:

Kabushiki Kaisha Donq d/b/a Donq Co., Ltd. ("Applicant") has applied to

register the stylized mark *DONQ* on the Principal Register for the

following goods and services:

"Processed meat products, namely croquettes, sausages, canned cooked
meat, bottled cooked meat, ham, bacon; processed vegetables and fruits,
namely jams, peanut butter, ground almonds, marmalade; pickled
vegetables, vegetable juices for cooking; soya milk; processed eggs; instant
or pre-cooked curry, soups, stew, soup mixes; edible oils and fats,

margarine; olive oil for food; milk products, namely, milk, cream, cheese, lactic acid drinks, butter, condensed milk," in International Class 29;

"Tea; roasted, powdered and granulated coffee, coffee in drinks; roasted, powdered, and granulated cocoa, cocoa in drinks; ice; unroasted coffee; cereal preparations, namely oat flakes, oat meals, corn flakes, spaghetti, uncooked Chinese noodles, bread crumb, macaronis; almond paste; sandwiches; hamburgers sandwiches; steamed buns stuffed with minced meat (niku-manjuh); pizzas; boxed ready-to-eat lunches consisting of rice and also containing side dishes such as cooked vegetables, meat and fishes; hot dogs sandwiches; meat pies; raviolis; yeast powder; yeast, baking powder; instant confectionery mixes namely instant jelly mixes, instant doughnut mixes, instant pudding mixes, instant pancake mixes; seasonings, namely cube sugar, fructose for food, crystal sugar, not confectionery, sugar, maltose for food, honey for food, glucose for food; spices, namely cinnamon powder, curry powder, mustard powder; ice cream mixes; sherbet mixes; confectionery, namely cakes, petit fours, pies, tarts, cookies, biscuits, crackers, waffles, pancakes, fruit jellies, puddings, frozen yoghurt, sherbets, ice cream, pastries, doughnuts, rusks; bread and buns," in International Class 30;

"Non-alcoholic beverages, namely carbonated beverages, non-alcoholic fruit juice beverages, vegetable juices, whey beverages," in International Class 32;

"Wholesale and retail store services and online wholesale and retail store services for bags and pouches; wholesale and retail store services and online wholesale and retail store services for foods and beverages excluding liquors; wholesale and retail store services and online wholesale and retail store services for hand tools, bladed or pointed hand tools, namely kitchen knives, paring knives, scissors, hardware namely nails, bolts of metal, nails of metal; wholesale and retail store services and online wholesale and retail store services for kitchen equipment, namely ice pails, non-electric whisks, forks, spoons, table knives, non-electric can openers, pot stands, bottle openers, non-electric cooking pots and pans, non-electric coffee pots, tablewares; wholesale and retail store services and online wholesale and retail store services for cleaning tools and washing utensils, namely washing brushes, buckets," in International Class 35; and

"Providing European cuisine; providing alcoholic beverages; providing tea, coffee, cocoa, carbonated beverages or fruit juices beverages; providing Japanese cuisine," in International Class 43.[1]

Destileria Serralles, Inc. ("Opposer") opposed the registration of Applicant's mark on the ground of likelihood of confusion under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), as well as on the ground of dilution by blurring under Section 43(c) of the Trademark Act, 15 U.S.C. § 1125(c), based on Opposer's assertedly famous DON Q and DON Q-formative marks.[2] Opposer pleaded ownership of the following registrations all for "rum" in International Class 33:[3]

Registration No. 341119 for the mark DON Q (in typeset format[4]) on the Principal Register; registered on December 1, 1936; Section 8 (10-YR) accepted/Section 9 granted on July 14, 2016;

---

[1] Application Serial No. 79101991, filed September 27, 2010, seeking an extension of protection of International Registration No. 0994744 under Trademark Act Section 66(a), 15 U.S.C. § 1141f(a).

[2] Opposer also pleaded lack of a *bona fide* intent to use the mark as of the filing date of the application as a ground for opposition, but did not pursue this claim at trial or argue it in its trial brief. In accordance with the Board's usual practice, we find this claim to have been waived by Opposer. *See Alcatraz Media, Inc.*, 107 USPQ2d 1750, 1753 (TTAB 2013) (opposer's pleaded descriptiveness and geographical descriptiveness claims not argued in brief deemed waived), *aff'd*, 565 F. App'x 900 (Fed. Cir. 2014) (mem.); *Krause v. Krause Publ'ns, Inc.*, 76 USPQ2d 1904, 1906 n.2 (TTAB 2005).

[3] Opposer also pleaded ownership of Registration Nos. 3719218 and 3268928 for the marks DONQ COCO and DONQ TROPICAL, respectively. These two registrations, however, have been canceled pursuant to Section 8 of the Trademark Act, 15 U.S.C. § 1058, and therefore will be given no consideration in our determination herein. *See Black & Decker Corp. v. Emerson Electric Co.*, 84 USPQ2d 1482, 1487 n.9 (TTAB 2007) (canceled registrations have no probative value).

[4] Prior to November 2, 2003, "standard character" drawings were known as "typed" or "typeset" drawings. A typed or typeset mark is the legal equivalent of a standard character mark. *See* Trademark Manuel of Examining Procedure ("TMEP") § 807.03(i) (October 2017).

Registration No. 2104164 for the mark DON Q GRAN ANEJO (in typeset format; GRAN ANEJO disclaimed) on the Principal Register; registered on October 7, 1997; Section 8 (10-YR) accepted/Section 9 granted on October 19, 2017;

Registration No. 3213822 for the mark DON Q LIMON (in typeset format; LIMON disclaimed) on the Principal Register; registered on February 27, 2007; Section 8 (10-YR) accepted/Section 9 granted on October 31, 2016;

Registration No. 3551745 for the mark DON Q PASION (in typeset format) on the Principal Register; registered on December 23, 2008; Section 8 and 15 affidavits accepted and acknowledged on February 8, 2014;[5] and

Registration No. 3793655 for the mark DONQ COCO (in standard characters; COCO disclaimed) on the Principal Register; registered on May 25, 2010; Sections 8 and 15 affidavits accepted and acknowledged on June 30, 2016.

In its answer to the notice of opposition, Applicant denied most of the salient allegations, including that Opposer will be damaged by registration of Applicant's mark.[6] Applicant, however, did admit the following: (1) that it applied to register its involved mark in connection with the goods and services listed in the preamble; (2) that Applicant is a Japanese corporation with its principal place of business in Japan; (3) that Applicant does not have an office located in the United States; (4) that Applicant filed its involved application

---

[5] The goods for this particular registration are identified as "fruit-flavored rum."

[6] 25 TTABVUE. Citations to the record or briefs in this opinion also include citations to the publicly available documents on TTABVUE, the Board's electronic docketing system. *See, e.g., Turdin v. Trilobite, Ltd.*, 109 USPQ2d 1473 (TTAB 2014). The number preceding "TTABVUE" corresponds to the docket entry number; the number(s) following "TTABVUE" refer to the page number(s) of that particular docket entry. No TTABVUE citation is provided for portions of the record designated confidential or under seal.

pursuant to Section 66(a) of the Trademark Act requesting an extension of protection to the United States of an international registration for Applicant's mark; (5) that Applicant did not use its mark for the goods and services covered in its involved application in U.S. commerce or in commerce between a foreign country and the United States prior to the filing date of its application and has yet to make such use; and (6) that Applicant operates a chain of French-style bakeries under the name DONQ in Japan, among other countries.[7]

Additionally, Applicant asserted two purported affirmative defenses, namely, (1) the notice of opposition fails to state a claim upon which relief may be granted, and (2) reservation of the right to raise additional affirmative defenses based upon information learned or obtained through additional investigation or discovery.[8] Insofar as Applicant neither filed a formal motion to dismiss pursuant to Fed R. Civ. P. 12(b)(6) during the interlocutory phase of this proceeding, nor argued this asserted affirmative defense in its brief, it is hereby deemed waived. *Alcatraz Media, Inc. v. Chesapeake Marine Tours Inc.*, 107 USPQ2d at 1753 n.6. With regard to Applicant's second affirmative defense, we note that a defendant cannot reserve unidentified defenses in its answer since it does not provide a plaintiff fair notice of such defenses. Because Applicant did not file a motion for leave to amend its answer to assert any

---

[7] 25 TTABVUE 3.

[8] *Id.*

additional affirmative defenses during the course of this proceeding, Applicant's second affirmative defense is also deemed waived.

## I.     The Record

The record includes the pleadings and, pursuant to Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), Applicant's application file. The record also comprises the evidence summarized below.[9] Additionally, both parties, by way of notices of reliance, submitted printouts from various websites downloaded from the Internet. Although admissible for what they show on their face, *see* Trademark Rule 2.122(e)(2), 37 C.F.R. § 2.122(e)(2), this evidence also constitutes hearsay and may not be relied upon for the truth of the matters asserted therein. Fed. R. Evid. 801(c); *Safer, Inc. v. OMS Investments, Inc.*, 94 USPQ2d 1031 (TTAB 2010); Trademark Trial and Appeal Board Manual of Procedure ("TBMP") § 704.08 (June 2017) ("Even if properly made of record, however … Internet printouts would only be probative of what they show on

---

[9] We note that some of the evidence proffered by both parties has been designated confidential and filed under seal. We have discussed only in general terms the relevant evidence submitted under seal. However, to the extent the parties have improperly designated testimony and evidence as confidential, the Board may disregard the confidential designation when appropriate. Trademark Rule 2.116(g), 37 C.F.R. § 2.116(g) ("[t]he Board may treat as not confidential that material which cannot reasonably be considered confidential, notwithstanding a designation as such by a party."). *See also Couch/Braunsdorf Affinity, Inc. v. 12 Interactive, LLC*, 110 USPQ2d 1458, 1461 (TTAB 2014). We further note that, effective June 24, 2016, the Board instituted a revised standard protective order for currently pending *inter partes* cases. However, insofar as the parties had already designated materials as confidential pursuant to the tiers of confidentiality under the Board's former protective order, those designations remain in effect. As such, the former standard protective order applies for this proceeding. Further information regarding the Board's new standard protective order is available at "Trademark Trial and Appeal Board News and Notices" at www.uspto.gov/ttab.

their face, not for the truth of the matters contained therein, unless a competent witness has testified to the truth of such matters."). However, to the extent that a party has acknowledged as fact any portion of this Internet evidence submitted by the adverse party, we deem such portions of the submitted Internet evidence stipulated into the record for the truth of any matters asserted therein.

### A. Opposer's Evidence[10]

Opposer made the following evidence of record:

Opposer's Notice of Reliance ("NOR") No. 1 consisting of status and title copies of Opposer's pleaded registrations that are valid and subsisting;[11]

Opposer's NOR Nos. 2-6 consisting of status and title copies of third-party registrations which purportedly show the relatedness of Opposer's

---

[10] Opposer, in support of its pleaded claims, has introduced into evidence and argued in its trial brief asserted common law rights in its pleaded DON Q marks used in connection with, *inter alia*, rum, rum cakes, chocolates and bar services. Applicant has objected to this common law rights evidence except as it pertains "rum." Under a separate order, the Board construed (1) Opposer's reliance on such common law rights as a motion for leave to amend its pleading to assert these common law rights, and (2) Applicant's objection as a motion to strike. *See* 98 TTABVUE. By the same order, the Board granted Applicant's construed motion to strike to the extent that the Board would not give any consideration to Opposer's common law rights in its DON Q marks used in connection with any goods or services other than rum, and accordingly, denied Opposer's construed motion for leave to amend its pleading. *Id*. The Board also declines Opposer's alternative request that the Board should consider its common law rights evidence for whatever probative value it may have regarding the *du Pont* likelihood of confusion factors in the event the Board does not allow Opposer to amend its pleading to assert such common law rights. Even if the Board were to consider such evidence, it would not be outcome determinative of this case. In view thereof, the Board will only take into consideration Opposer's valid and subsisting pleaded registrations of record, as well as its common law rights in the DON Q marks for "rum," as forming the basis of Opposer's asserted claims.

[11] 36 TTABVUE.

goods with Applicant's Class 29, 30, and 32 goods, as well as Applicant's Class 35 and Class 43 services;[12]

Opposer's NOR No. 7 consisting of printouts from webpages of "fast casual restaurants, including bakeries and other food establishments" that purportedly show that these establishments offer both bakery and other food items and alcohol for sale;[13]

Opposer's NOR No. 8 consisting of status and title copies of third-party registrations which purportedly show that marks registered in Class 33 for alcohol are similarly registered for goods and services in Classes 29, 30, 32, 35 and 43 by the same registrant;[14]

Opposer's NOR No. 9 consisting of printouts of portions of websites from various alcohol brands, namely, Smirnoff, Bacardi, Jose Cuervo, Captain Morgan, Jack Daniel's, Maker's Mark, Johnnie Walker, Bailey's, Kahlua, Remy Martin, and Ketel One, as well as other retail commercial third-party websites, offered to demonstrate the similarities of the parties' goods and services and Opposer's natural zone of expansion of use of its DON Q marks and right to "bridge the gap" with products or services for sale related to Applicant's identified goods and services;[15]

Opposer's NOR No. 10 consisting of Applicant's supplemental responses to Opposer's First Set of Interrogatories and Applicant's responses to Opposer's First and Second Set of Requests for Admission;[16]

Opposer's NOR No. 11 consisting of a completed cross-word puzzle wherein the term DONQ is the answer to the question "Rum named for a Cervantes hero" printed in the September 7-25, 2015 edition of *New York* magazine offered to demonstrate the purported fame of Opposer's DON Q mark;[17]

Opposer's NOR No. 12 consisting of printouts of various third-party websites offered to rebut the testimony of Applicant's witness, Kanji

---

[12] 37-41 TTABVUE.

[13] 42 TTABVUE.

[14] 43 TTABVUE.

[15] 45 TTABVUE.

[16] 44 TTABVUE.

[17] 46 TTABVUE.

Yamagishi and other evidence submitted by Applicant during its testimony period;[18] and

Testimony of Roberto Serralles, Opposer's Vice President of Business Development and Commercial Director, and accompanying trial exhibits.[19]

### B. Applicant's Evidence

Applicant has made the following evidence of record:

Applicant's NOR No. 1 consisting of printouts of portions of third-party websites of business entities operating under the marks DON QUIXOTE or QUIXOTE for restaurants and bar services, and for alcohol offered to show the weakness of Opposer's pleaded marks;[20]

Applicant's NOR No. 2 consisting of printouts of portions of third-party websites of business entities whose tradename ends with the letter "Q" purportedly to demonstrate that the letter "Q" is commonly substituted for the letter "K" or the "K" sound at the end of a word;[21]

Applicant's NOR No. 3 consisting of (1) Applicant's responses and supplemental responses to Opposer's First Set of Interrogatories submitted pursuant to Trademark Rule 2.120(k)(5), 37 C.F.R. § 2.120(k)(5) and (2) Opposer's responses to some of Applicant's First Set of Interrogatories;[22]

Applicant's NOR No. 4 consisting of portions of various third-party websites submitted for the purpose of purportedly demonstrating the commercial impression created by Applicant's DONQ mark;[23]

---

[18] 78 TTABVUE.

[19] 58 TTABVUE. Opposer filed Trial Exhibit 12 (a DVD) from the testimony of Mr. Serralles separately. *See* 59 TTABVUE.

[20] 60 TTABUVE.

[21] 61 TTABVUE.

[22] 62 TTABVUE.

[23] 63 TTABVUE.

Applicant's NOR No. 5 consisting of portions of third-party websites purportedly reflecting the marketing expenditures in the rum industry and the size of the rum and spirits marketplace;[24]

Applicant's NOR Nos. 6-7 consisting of third-party registrations and websites offered to show that there are many examples of identical or highly identical marks that are registered for alcoholic beverages by one party that coexist with registrations for restaurant or similar services registered by an unrelated party;[25]

Applicant's NOR No. 8 consisting of third-party registrations offered to show examples of identical or similar marks registered and used for alcoholic beverages by one party that coexist with registrations for non-alcoholic beverages in International Class 32 registered by an unrelated party;[26]

Applicant's NOR No. 9 consisting of third-party registrations offered to show examples of identical or similar marks registered and used for alcoholic beverages by one party that coexist with registrations for foods in International Classes 29 or 30 registered by an unrelated party;[27]

Applicant's NOR No. 10 consisting of printed publications and official trademark records offered to provide context and rebut the alleged evidence of third-party registrations introduced by Opposer by providing current status and additional evidence relevant to the evaluation of the third-party registrations of record;[28] and

Testimony of Kanji Yamagishi, Manager of Applicant's Overseas Development, and accompanying trial exhibits.[29]

---

[24] 74 TTABVUE.

[25] 64 and 75 TTABVUE.

[26] 65 TTABVUE.

[27] 66 TTABVUE.

[28] 67 TTABVUE.

[29] 80 TTABVUE.

*II.    Preliminary Issue.*

*Applicant's Motion to Amend the Class 43 Recitation of Services.*

On August 4, 2015, Applicant filed a motion to amend its involved application to delete the wording "providing alcoholic beverages" from the recitation of services in International Class 43, one of the five classes of goods and services opposed.[30] Applicant seeks entry of the amendment without Opposer's consent, and with judgment as to the grounds for opposition, but without a *res judicata* effect by the entry of that judgment. Applicant argues that entry of its proposed amendment should not have *res judicata* effect because "the deletion of 'providing alcoholic beverages' removes from the identification the sole reference to alcohol; the remaining services travel through different channels of trade and are sold to different customers; and alcoholic beverages … are not inherently related to food, beverage, and restaurant services because 'something more' is required for a finding of likelihood of confusion when those services are at issue."[31]

In its brief in opposition to the motion, Opposer argued that the amendment and resulting judgment should be given *res judicata* effect.[32] By order dated

---

[30] 32 TTABVUE. The amendment is allegedly required by a settlement agreement between Applicant and the opposer in Opposition No. 91204134, which also involves the subject application. Opposition No. 91204134 is currently suspended pending the disposition of this proceeding.

[31] *Id.* at p. 2; 32 TTABVUE 2.

[32] 33 TTABVUE.

September 14, 2015, the Board deferred consideration of Applicant's motion to amend until final hearing.[33] We now entertain Applicant's motion to amend.

An application involved in an opposition proceeding may not be amended in substance except with the consent of the other party and the approval of the Board, or except upon motion. Trademark Rule 2.133(a), 37 C.F.R. § 2.133(a).

As the Board stated in *Int'l Harvester Co. v. Int'l Telephone & Telegraph Corp.*, 208 USPQ 940, 941 (TTAB 1980):

> [T]he Board has adopted the practice of permitting amendments to the identification of goods and/or services made prior to trial even when the opposer objects if the proposed amendment serves to limit the scope of goods and/or services and if applicant consents to judgment on the question of likelihood of confusion between opposer's mark and applicant's mark with respect to the broader identification of goods (which in effect, means all the goods which the amendment would serve to remove from the identification of goods phrased in broad terms) or to any of the specific goods which applicant seeks to remove from a list of goods by the proposed amendment. See: Mennan Company v. Nippon Menard Cosmetic Co., Ltd., 195 USPQ 737 (TTAB 1977). The entry of judgment will preclude applicant from seeking to register its mark at a later date for the goods [or services] removed or deleted from the original identification, thereby freeing opposer from the task of filing another opposition on the same issue.

Furthermore, in order to avoid the possibility of a *res judicata* effect of the entry of judgment, an applicant seeking to amend its application must establish *prima facie* that the amendment serves to change the nature and character of the remaining goods and/or services or to restrict their trade channels and customers in such a manner that a substantially different issue has been

---

[33] 35 TTABVUE.

introduced from the issue presented by the opposition against the application based upon the original identification of goods or services. *See Giant Food, Inc. v. Standard Terry Mills, Inc.*, 229 USPQ 955, 964 (TTAB 1986); *Int'l Harvester Co. v. Int'l Telephone & Telegraph Corp.*, *supra.* Based on the record, Applicant has not made the necessary *prima facie* showing that the deletion of "providing alcoholic beverages" serves to change the nature and character of the remaining services in International Class 43 or that the amendment restricts their channels of trade and customers so as to introduce a substantially different issue for trial. Specifically, Applicant has failed to provide any evidence to demonstrate that entities that provide European or Japanese cuisines or certain non-alcoholic beverages use different channels of trade and have different customers than entities that provide alcoholic beverages.

Accordingly, Applicant's motion to amend is granted to the extent that the service identified as "providing alcoholic beverages" is deleted from the International Class 43 recitation of services and judgment is entered against Applicant with regard to this deleted service. Moreover, such judgment has *res judicata* effect because Applicant failed to make the requisite *prima facie* showing that the amendment would serve to create a substantially different issue from the issue presented by the opposition against the application based upon the original International Class 43 recitation of services.[34]

---

[34] Because we have granted Applicant's motion to amend its Class 43 recitation of services to exclude the service of "providing alcoholic beverages," the remainder of this decision will be analyzed based on the Class 43 services as amended.

### III.    *Evidentiary Objections*

Applicant has filed a number of objections against certain testimony and evidence introduced by Opposer. Initially, we note that Applicant has objected to certain testimony and evidence submitted by Opposer on the ground of relevancy. The Board is capable of weighing the relevance and strength or weakness of the objected-to testimony and evidence in this case, including any inherent limitations, and this precludes the need to strike the challenged testimony and evidence on relevancy grounds. We have accorded the testimony and evidence whatever probative value it merits, keeping Applicant's relevancy objections in mind, and comment as needed on its probative value elsewhere in this opinion. *See Alcatraz Media Inc. v. Chesapeake Marine Tours Inc.*, 107 USPQ2d at 1755; *Kohler Co. v. Baldwin Hardware Corp.*, 82 USPQ2d 1100, 1104 (TTAB 2007).

Applicant also objects to Opposer's submission of third-party registrations registered under Trademark Act Sections 66(a) or 44(e) because such registrations do not demonstrate use or consumer exposure in the marketplace, as well as the submission of canceled third-party registrations.

To the extent Opposer has submitted third-party registrations issued under either Section 44(e) or Section 66(a) of the Trademark Act with no claim of use in commerce, we have not given any consideration to such registrations because they do not demonstrate exposure of the marks subject to the registrations to U.S. consumers through use in commerce and, therefore, have no probative

value. *See In re 1ˢᵗ USA Realty Professionals, Inc.*, 84 USPQ2d 1581, 1583 (TTAB 2007); *In re Albert Trostel & Sons Co.*, 29 USPQ2d 1783 (TTAB 1993). Additionally, to the extent Opposer has submitted canceled third-party registrations in support of its claims, we have given no consideration to such third-party registrations. *See Black & Decker Corp.*, 84 USPQ2d at 1487 n.9.[35]

Applicant further objects to certain testimony introduced by Opposer on the ground that it violates the "best evidence rule." Specifically, Applicant maintains that Opposer's trial witness, Mr. Serralles, testified on matters such as Opposer's sales, revenue, advertising and marketing activities that were not corroborated by documentary evidence even though Applicant requested documents related to such matters pursuant to Applicant's written discovery but they never were produced by Opposer.

The "best evidence rule" is a common law concept that has been codified in Rule 1002 of the Federal Rules of Evidence, which states: "To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress." Fed. R. Evid. 1002. The "best evidence rule" requires the production

---

[35] We note that the overwhelming number of third-party registrations submitted by Opposer have been canceled or consist of third-party registration issued under Section 44(e) or Section 66(a) of the Trademark Act with no claim of use in commerce. The introduction of such non-probative evidence impedes the orderly administration of this case, and obscures the impact of truly relevant evidence. In addition to diminishing the effectiveness of a party's evidentiary record, "papering" the Board with evidence lacking any probative value causes delays in rendering a final decision. Parties should submit only relevant, non-cumulative evidence. *See* TBMP § 702.05 and cases cited therein.

of the original document when the contents of that document are at issue. Federal Rule of Evidence 1004 excuses this requirement where it can be shown that the original has been lost or destroyed, as long as unavailability is not the result of the proponent's bad faith, the original is not obtainable, or the document is not closely related to a controlling issue.

We note that Applicant failed to introduce into evidence its document requests and Opposer's responses thereto that concern the subjects of testimony to which Applicant has objected. Accordingly, the Board cannot ascertain whether Opposer responded to such discovery requests by stating that it had no responsive documents in its custody, possession, or control or that responsive documents would be produced but never were. If the former, Applicant's objection based on the "best evidence rule" would be unsubstantiated since no corroborating documents would exist which would invoke the rule. If the latter, Applicant could have filed a motion to compel the documents but did not do so and therefore would not now be heard to complain that Opposer's testimony is in violation of the "best evidence rule." Indeed, a party seeking discovery must take positive steps to pursue that goal, even when the responding party may appear recalcitrant in its responses. Because the document requests and responses thereto are not of record, we find that Applicant has failed to support

properly its objection based on the "best evidence rule," and, therefore, the objection is overruled.[36]

Finally, Applicant objects to certain evidence it contends has not been offered for the record, namely, Opposer's Trial Exhibits 23-28 and 38-39. Pursuant to Trademark Rule 2.123(e)(2), 37 C.F.R. § 2.123(e)(2), "[e]xhibits which are marked and identified at the deposition will be deemed to have been offered into evidence, without any formal offer thereof, unless the intention of the party marking the exhibits is clearly expressed to the contrary." Following a careful review of the testimony transcript of Mr. Serralles, it is evident that Opposer specifically offered into evidence Exhibits 23-28. *See* Serralles Dep. p. 192 ("At this time, I'm going to offer into evidence Exhibits 1 through 18, 22 through 31 and 32 through 37.") Accordingly, Applicant's objection to Opposer's Trial Exhibits 23-28 is overruled. With regard to Opposer's Trial Exhibits 38 and 39, we find that Opposer never introduced these exhibits into the record. However, we note that Applicant introduced these same exhibits during Applicant's trial witness's testimony deposition. Opposer may rely on evidence and testimony introduced by Applicant. Trademark Rule 2.122(a), 37 C.F.R. § 2.122(a). Once testimony or any other evidence is introduced, it is of record for any purpose, and the adverse party need not take any action in order to rely on

---

[36] Applicant also objected to testimony under the "best evidence rule" regarding Opposer's common law rights on goods that are not subject to Opposer's pleaded registrations. Because we have determined that Opposer cannot rely on its common law rights for goods or services other than rum as a basis for its asserted claims, Applicant's objection is deemed moot with regard to this particular testimony.

it. *See Bos. Athletic Ass'n v. Velocity, LLC*, 117 USPQ2d 1492, 1494 n.7 (TTAB 2015) (testimony deposition made of record by plaintiff need not have been filed under notice of reliance by defendant); *American Lebanese Syrian Associated Charities Inc. v. Child Health Research Institute*, 101 USPQ2d 1022, 1025 (TTAB 2011). In view thereof, Applicant's objection, as it pertains to Opposer's Trial Exhibits 38 and 39, also is overruled.

## IV.    Standing

Standing is a threshold issue that must be proven by the plaintiff in every *inter partes* case. *See Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014), *cert. denied*, 135 S. Ct. 1401 (2015). Our primary reviewing court, the U.S. Court of Appeals for the Federal Circuit, has enunciated a liberal threshold for determining standing, namely that a plaintiff must demonstrate that it possesses a "real interest" in a proceeding beyond that of a mere intermeddler, and "a reasonable basis for his belief of damage." *Empresa Cubana Del Tabaco* 111 USPQ2d at 1062 (citing *Ritchie v. Simpson*, 170 F.3d 1902, 50 USPQ2d 1023, 1025-26 (Fed. Cir. 1999)). A "real interest" is a "direct and personal stake" in the outcome of the proceeding. *Ritchie v. Simpson*, 50 USPQ2d at 1026.

Opposer has demonstrated through the USPTO database printouts made of record that it is the owner of its pleaded registrations and that all but two are valid and subsisting. Because Opposer's valid and subsisting registrations are of record, Opposer has established its standing. *See Cunningham v. Laser*

*Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000); *Lipton Ind., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982).

V.      *Section 2(d) Claim*

We will now consider Opposer's Section 2(d) claim, focusing on Opposer's registered marks DON Q (Registration No. 341119) and DONQ COCO (Registration No. 3793655) for the goods identified therein, *i.e.*, "rum," pleaded and made of record. In our view, these two registrations, coupled with their corresponding identified goods, are most likely to support a likelihood of confusion claim. If Opposer could prevail on its Section 2(d) claim on these registrations, then consideration of others would be unnecessary; and if Opposer could not, then consideration of other less relevant registrations would not assist Opposer. *See, e.g.*, *The North Face Apparel Corp. v. Sanyang Indus. Co.*, 116 USPQ2d 1217, 1225 (TTAB 2015) (citing *In re Max Capital Group Ltd.*, 93 USPQ2d 1243, 1245 (TTAB 2010)).

A. *Priority*

Priority is not at issue in view of Opposer's ownership of the valid and subsisting registrations noted above for the goods identified therein. *See King Candy, Inc. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108 (CCPA 1974).

B. *Likelihood of Confusion*

We base our determination under Section 2(d) on an analysis of all of the probative evidence of record bearing on the likelihood of confusion. *In re E. I.*

*du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) ("*du Pont*"); s*ee also In re Majestic Distilling Co.,* 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003). "Not all of the *DuPont* factors are relevant to every case, and only factors of significance to the particular mark need be considered." *In re Mighty Leaf Tea*, 601 F.3d 1342, 94 USPQ2d 1257, 1259 (Fed. Cir. 2010). For example, the Board can "focus … on dispositive factors, such as similarity of the marks and relatedness of the goods." *Herbko Int'l, Inc. v. Kappa Books, Inc.,* 308 F.3d 1156, 64 USPQ2d 1375, 1380 (Fed. Cir. 2002) (quoting *Han Beauty, Inc. v. Alberto-Culver Co.,* 236 F.3d 1333, 57 USPQ2d 1557, 1559 (Fed. Cir. 2001)). The fame of the prior mark can also be critical. *Bose Corp. v. QSC Audio Products Inc.,* 293 F.3d 1367, 63 USPQ2d 1303, 1305 (Fed. Cir. 2002). These factors, and the other relevant *du Pont* factors are discussed below.

*The Marks*

We now consider the first *du Pont* likelihood of confusion factor, which involves an analysis of the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression. *See Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1691 (Fed Cir. 2005) (quoting *du Pont*, 177 USPQ at 567). "The proper test is not a side-by-side comparison of the marks, but instead 'whether the marks are sufficiently similar in terms of their commercial impression' such that persons who encounter the marks would be likely to assume a connection between the parties." *Coach Servs., Inc. v.*

*Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1721 (Fed. Cir. 2012) (internal citation omitted). The focus is on the recollection of the average purchaser, who normally retains a general rather than a specific impression of trademarks. *In re Binion*, 93 USPQ2d 1531, 1534 (TTAB 2009); *Sealed Air Corp. v. Scott Paper Co.*, 190 USPQ 106, 108 (TTAB 1975). Our analysis cannot be predicated on dissection of the involved marks. *See Stone Lion Capital Partners, LP v. Lion Capital LLP,* 746 F.3d 1317, 110 USPQ2d 1157, 1161 (Fed. Cir. 2014). Rather, we are obliged to consider the marks in their entireties. *Id.*; *see also Franklin Mint Corp. v. Master Mfg. Co.,* 667 F.2d 1005, 212 USPQ 233, 234 (CCPA 1981) ("It is axiomatic that a mark should not be dissected and considered piecemeal; rather, it must be considered as a whole in determining likelihood of confusion."). Nonetheless, there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on a consideration of the marks in their entireties. *Stone Lion*, 110 USPQ2d at 1161.

We now turn to our comparison of Opposer's marks and Applicant's mark. Initially, we compare Opposer's DONQ COCO mark and Applicant's DONQ mark. We find that the term DONQ is the dominant feature of Opposer's mark, particularly since it is the first term in the mark. *See Palm Bay Imps.,* 73 USPQ2d at 1692 ("VEUVE . . . remains a 'prominent feature' as the first word in the mark and the first word to appear on the label"); *In re Integrated Embedded,* 120 USPQ2d 1504, 1513 (TTAB 2016) ("[T]he dominance of BARR

in [a]pplicant's mark BARR GROUP is reinforced by its location as the first word in the mark."); *Presto Prods., Inc. v. Nice-Pak Prods., Inc.*, 9 USPQ2d 1895, 1897 (TTAB 1988) ("it is often the first part of a mark which is most likely to be impressed upon the mind of a purchaser and remembered" when making purchasing decisions). Additionally, we note that Opposer has disclaimed the descriptive term "COCO." Disclaimed matter that is descriptive of or generic for a party's goods and/or services is typically less significant or less dominant when comparing marks. *See In re Dixie Rests., Inc.*, 105 F.3d 1405, 41 USPQ2d 1531, 1533-34 (Fed. Cir. 1997); *In re Nat'l Data Corp.*, 753 F.3d 1056, 224 USPQ 749, 752 (Fed. Cir. 1985). We also find that the presence of COCO does not change the connotation or meaning of DONQ in the context of the mark as a whole. Finally, the fact that Applicant's mark appears in a particular typeface is of no import in our analysis since Opposer's DONQ COCO mark is registered in standard characters and therefore we must consider Opposer's mark in all depictions "regardless of font style, size, or color," including the stylization used by Applicant. *Citigroup Inc. v. Capital City Bank Group Inc.*, 637 F.3d 1344, 98 USPQ2d 1253, 1258-59 (Fed. Cir. 2011).

Because the first word in a mark is more likely to be impressed upon a purchaser's mind and since disclaimed matter is less dominant than matter that has not been disclaimed, we find that Opposer's DONQ COCO mark and

Applicant's DONQ mark, when considered in their entireties, are similar in appearance, sound, commercial impression and connotation.[37]

We next compare Opposer's DON Q mark and Applicant's DONQ mark. Both marks are comprised of the identical four letters. Visually, the only differences between the marks are the space between the letters "N" and "Q" in Opposer's mark and the stylized font of Applicant's mark. However, as noted above, we must consider Opposer's DON Q mark, registered in standard characters, in all depictions including the particular font style employed by Applicant.

With regard to pronunciation, Applicant argues that its DONQ mark will likely be understood as one word ending in a "q," and consumers are likely to pronounce it phonetically as "donk," so that its pronunciation differs from the likely pronunciation of Opposer's "DON Q" mark as "don queue."[38] In support of its argument, Applicant maintains that the American use of the "k" sound

---

[37] Because it was not filed until after the close of Applicant's testimony period, Applicant requests that the Board take judicial notice of the specimen of use submitted with Opposer's Section 8 and 15 affidavits filed in support of its DONQ COCO registration to demonstrate that Opposer is actually using its mark as DON Q COCO i.e., with a space between the letters N and Q, so that Opposer is not using the mark as identified in the registration. Applicant's Trial Brief, p. 30 n.15; 88 TTABVUE 34. We note that the basis of Applicant's request effectively amounts to an impermissible collateral attack on Opposer's pleaded registration, namely, asserting nonuse of the registered mark. Absent a counterclaim against this registration, not present in this proceeding, Applicant may not attack the validity of Opposer's DONQ COCO registration. Trademark Rule § 2.106(b)(2)(ii), 37 C.F.R. § 2.106(b)(2)(ii). Accordingly, Applicant's request is denied.

[38] Applicant's Trial Brief, pp. 26-27; 88 TTABVUE 30-31; Applicant's NOR. 2; 61 TTABVUE.

for words ending in the letter "q," such as Iraq or the prefix "tranq-", confirms that U.S. consumers will be naturally inclined toward the "donk" pronunciation.[39] Applicant further contends that the prevalence of one-word trademarks that substitute the letter "q" for "k" — for example PUNQ for punk rock records, LOOQ for light bulbs, or HONQ for social media services — also provide evidence that American consumers are likely to pronounce "Donq" as "Donk."[40]

Opposer maintains that Applicant has failed to submit any evidence that consumers will view the "Q" in Applicant's DONQ mark as a visual and phonetic substitution for the letter "K."[41] Moreover, Opposer argues that the examples provided by Applicant are inconsequential since they merely show the replacement of a "q" for a "k" in a word that already has an established and ordinary meaning, unlike the term "DONQ" that has no such connotation.[42]

For purposes of the Section 2(d) analysis, it is well recognized "that there is no correct pronunciation of a trademark, and consumers may pronounce a mark differently than intended by the brand owner." *In re Viterra Inc.*, 671 F.3d 1358, 1367, 101 USPQ2d 1905, 1912 (Fed. Cir. 2012); *see also Centraz. Indus. v. Spartan Chem. Co.*, 77 USPQ2d 1698, 1701 (TTAB 2006). Because it is impossible to predict how the consuming public will pronounce a particular

---

[39] Applicant's Trial Brief, p. 26; 88 TTABVUE 30.

[40] Applicant's NOR No. 2; 61 TTABVUE 5-13, 46.

[41] Opposer's Reply Brief, p. 11; 91 and 92 TTABVUE 16.

[42] *Id*.

mark, a purportedly correct pronunciation cannot be relied on to avoid a likelihood of confusion. *In re Viterra Inc.*, 101 USPQ2d at 1912. In any event, giving due regard to the slight visual differences between DON Q and DONQ, we bear in mind that marks must be considered in light of the fallibility of memory, *see In re St. Helena Hosp.*, 774 F.3d 747, 113 USPQ2d 1082, 1085 (Fed. Cir. 2014), and that the average customer retains a general rather than specific impression of the marks. *Inter IKEA Sys. B.V. v. Akea, LLC*, 110 USPQ2d 1734, 1740 (TTAB 2014). Therefore, we find that while some consumers may pronounce the parties' respective marks differently, some consumers may perceive the marks phonetically similar, particularly in light of the visual similarities of the marks and the fallible recollection of the average consumer.

With regard to the connotation and commercial impression of the parties' respective marks, Opposer contends that since both marks are based on and call to mind the legendary Spanish character Don Quixote from the famous Miguel de Cervantes novel, the marks share a similar connotation and commercial impression.[43] In support of its contention, Opposer refers to the testimony of Applicant's trial witness, Mr. Yamagishi, who testified as follows:

> "How we got our name. Later on we were named for Don Quixote. You probably know the name from the Spanish novel, but this was also the nickname given to the third person to lead the company….the third person who took over the business, Mr. Yukio Fujii, was referred to as 'Don Quixote' in terms of his personal characteristics."[44]

---

[43] Opposer's Trial Brief, p. 25; 84 TTABVUE 33; Serralles Testimony, 11:9-25; 58 TTABVUE 17.

[44] Yamagishi Testimony, pp. 11-12; 80 TTABVUE 18-19

Moreover, Opposer argues that even those consumers who view Applicant's mark as one word are likely to be confused with Opposer's DON Q mark because Opposer used its DON Q mark both with and without a space for decades until 2014, including in a horizontal format with DON joined with a capital letter Q, as shown below, and therefore would convey the same commercial impression as evoked by Applicant's DONQ mark.[45] While our comparison of the marks is restricted to Opposer's marks as registered, the extrinsic evidence of use, in this case, is relevant to consumer perception as to connotation and commercial impression of the respective marks.

  



While conceding that its DONQ mark was originally derived from the story of Don Quixote, Applicant argues that the record is devoid of any evidence to prove that Don Quixote makes up any part of the ongoing connotation or commercial impression created by its DONQ mark, or that U.S. consumers will interpret it as such.[46] Indeed, Applicant maintains that the derivation of its

---

[45] *Id.* at 12-13; 58 TTABVUE 17-18; *Id.*, Exhs. 2 and 3; 58 TTABUVE 474-476.

[46] Applicant's Trial Brief, p. 8; 88 TTABUVE 12.

DONQ mark has not been featured in its advertisements and it has no plans to associate itself with the Don Quixote character in the United States.[47] Just because Applicant does not advertise the origins of its mark in its marketing materials, and has no intent to do so when it eventually enters the U.S. market, does not detract from the fact that Applicant adopted its DONQ mark based on the DON QUIXOTE character in the Cervantes novel and/or an employee who displayed characteristics of such fictional character. If Applicant, when creating the mark, thought the mark evocative of the character, then consumers faced with the mark may be just as likely to consider the mark in the same way.

Applicant further argues that its French bakery trade dress, including the term "boulangerie française" and French baker design,[48] as illustrated below, used in connection with its DONQ mark, creates a commercial impression for its mark that is distinct from that of Opposer's DON Q mark.

 boulangerie $DONQ$ française

Applicant's argument that its DONQ mark is not confusingly similar based on how it is used in the marketplace is unavailing. First, the extrinsic evidence submitted by Applicant concerns use of its mark in Japan and not the United

---

[47] *Id.*, pp. 8-9; 88 TTABUVE 12-13.

[48] Yamagishi Testimony, Exhs. 29; 80 TTABVUE 407-502.

States. Accordingly, U.S. consumers likely have not been exposed to Applicant's trade dress. Second, and more importantly, we are constrained to make our determination based on the applied-for mark and not on its manner of use based on extrinsic evidence. *In re Shell Oil Co.*, 922 F.2d 1204, 26 USPQ2d 1687, 1690 n.4 (Fed. Cir. 1993) ("Although Shell argues that its use of RIGHT-A-WAY would be in association with other Shell trademarks, the proposed registration is not so limited. Registrability is determined based on the description in the application, and restrictions on how the mark is used will not be inferred.").

Although we cannot consider extrinsic evidence regarding the manner in which Applicant uses its DONQ mark in the marketplace to avoid a finding that confusion is likely, the same does not necessarily hold true if such extrinsic evidence supports a finding of likelihood of confusion. Indeed, our primary reviewing Court has explained that while we do not ordinarily look to trade dress regarding registrability questions, "trade dress may nevertheless provide evidence of whether the word mark projects a confusingly similar commercial impression." *Specialty Brands, Inc. v. Coffee Bean Distributors, Inc.*, 748 F.2d 669, 223 USPQ 1281, 1284 (Fed. Cir. 1984); *see also Kenner Park Toys, Inc. v. Rose Art Industries Inc.*, 963 F.2d 350, 22 USPQ2d 1453, 1458 (Fed. Cir. 1992).

In view of the foregoing, we find that Opposer's DON Q mark and Applicant's DONQ mark convey a similar connotation and commercial impression. Accordingly, when viewing the respective marks DON Q and DONQ in their entirety, we find that they are, at a minimum, similar in

appearance, connotation and commercial impression, notwithstanding how a consumer may pronounce the parties' respective marks. *In re White Swan Ltd.*, 8 USPQ2d 1534, 1535 (TTAB 1988) (similarity in either sight, sound or connotation is sufficient to support likely confusion).

Accordingly, we find that, taken in their entireties, the similarities between Opposer's DON Q and DONQ COCO marks and Applicant's DONQ mark outweigh any differences for likelihood of confusion purposes. The first *du Pont* factor thus supports a finding that confusion is likely.

*Fame of Opposer's DON Q Mark*

We next turn to the alleged fame of Opposer's DON Q mark.[49] Fame of the prior mark, if it exists, plays a dominant role in balancing the likelihood of confusion factors. *Bose Corp.,* 63 USPQ2d at 1305. Fame for likelihood of confusion purposes arises as long as a "significant portion of the relevant consuming public ... recognizes the mark as a source indicator." *See Palm Bay Imps.,* 73 USPQ2d at 1694. "[T]he proper legal standard for evaluating the fame of a mark under the fifth *DuPont* factor is the class of customers and potential customers of a product or service, and not the general public." *Joseph Phelps Vineyards, LLC v. Fairmont Holdings, LLC*, 122 USPQ2d 1733, 1734 (Fed. Cir. 2017) (internal citation omitted). "[L]ikelihood of confusion fame

---

[49] Opposer has only submitted evidence regarding the alleged fame of its pleaded DON Q mark. Accordingly, our fame analysis under the fifth *du Pont* factor will be limited to only this mark. Moreover, in analyzing this *du Pont* factor, we have considered all relevant evidence including evidence submitted under seal as confidential.

varies along a spectrum from very strong to very weak." *Id*. (internal citation omitted). Such fame may be measured indirectly by the volume of sales and advertising expenditures of the goods sold under the mark, for example, and other factors such as length of time the mark has been in use; widespread critical assessments; notice by independent sources of the products identified by the marks; and the general reputation of the products and services. *Bose Corp.*, 63 USPQ2d at 1308; *Blue Man Productions Inc. v. Tarmann,* 75 USPQ2d 1811, 1817 (TTAB 2005), *rev'd on other grounds*, slip. op. 05-2037, (D.D.C.Apr. 3, 2008). This information, however, must be placed in context (*e.g.*, a comparison of advertising figures with competitive products, market share, reputation of the product, etc.). *Bose Corp.*, 63 USPQ2d at 1308.

To demonstrate fame, Opposer provided a variety of evidence, some of which is confidential and therefore will be discussed only in general terms.[50] The evidence of record shows that (1) Opposer has been using its DON Q mark in connection with the sale of rum for approximately 80 years; (2) Opposer's DON

---

[50] Most of Opposer's evidence of purported fame is in the form of trial testimony without any corroborating documentary evidence. It is well established, however, that testimony by a witness or witnesses personally conversant with the facts, and which is "clear, convincing, consistent, and sufficiently circumstantial to convince the trier of fact of the probative value thereof," may be relied upon to prove the facts stated therein. *Liqwacon Corp. v. Browning-Ferris Indus., Inc.*, 203 USPQ 305, 316 (TTAB 1979); *see also Productos Lacteos Tocumbo S.A. de C.V. v. Paleteria La Michoacana Inc.*, 98 USPQ2d 1921, 1931 (TTAB 2011) ("While it is certainly preferable for a party's testimony to be supported by corroborating documents, the lack of documentary evidence is not fatal"). Here, it is evident that Opposer's trial witness, Mr. Serralles, testifying as Opposer's Vice President of Business Development and Commercial Director, is quite familiar with the operation of Opposer's business and there is nothing in the record to indicate that his testimony is other than clear and consistent.

Q rum is the number one selling spirit on the island of Puerto Rico; (3) Opposer's DON Q rum is one of the top 10 rums sold nationally;[51] (4) between 2008 and 2015, Opposer generated significant nationwide sales of its DON Q rum, with its top selling markets in Florida, Texas, California, Illinois, Massachusetts, New Jersey, Pennsylvania, Minnesota, Wisconsin and Colorado;[52] (5) Opposer advertises its DON Q rum nationally through television, billboards, bus shelters and subway panels, print ads in magazines and newspapers, Internet advertising, point of sale, and events and sponsorships, which include food and wine events and film festivals; (6) between 2009-2014, Opposer spent a significant yearly dollar amount on advertising, an overwhelming majority of which was spent on advertising in the United States, excluding Puerto Rico;[53] (7) the quality of Opposer's DON Q rum has been recognized with awards from independent organizations, such as the American Academy of Hospitality Science, the Ultimate Spirits Challenge, and The Rum Renaissance, a purportedly large rum competition in Miami, Florida; (8) Opposer's DON Q rum has been featured in certain scenes of films, such as TED, BRIDEMAIDS, as

---

[51] Opposer has not submitted any evidence to show how many rum distillers exist and/or sell rum in the United States. Neither does the evidence show where Opposer's DON Q rum ranks among the top ten bestselling rums in the United States or what its market share is among rum distillers. Without such information, the fact that Opposer's DON Q rum is one of the top 10 rums sold nationally is of limited probative value.

[52] Opposer did not submit any evidence regarding its sales prior to 2008, despite claiming use of its DON Q mark for 80 years.

[53] As with its sales figures, Opposer did not submit any evidence regarding its advertising expenditures for its DON Q rum prior to 2009.

well as FIVE-YEAR ENGAGMENT; and (9) that Opposer's rum has garnered some, albeit minimal, unsolicited publicity and media attention.

While this evidence supports a finding of noteworthy renown attributable to Opposer's pleaded DON Q mark since 2008, we find that Opposer's mark has only achieved a marginal degree of fame under the fifth *du Pont* factor to the extent that it would not outweigh all the other *du Pont* factors in Applicant's favor, especially when we consider the evidence submitted under seal as confidential that concerns, *inter alia*, the degree and/or extent of recognition of Opposer's DON Q mark for rum by relevant consumers. Additionally, Opposer has failed to submit any evidence of (1) how its sales and advertising figures compare to its competitors in the industry, (2) how many times consumers encounter its DON Q mark for rum, or (3) any context for its achievments in the rum distillery trade, e.g., marketshare. Without comparative numbers or marketshare percentages, it is difficult to place the apparent success or renown of Opposer's DON Q mark into context. *Bose Corp.*, 63 USPQ2d at 1309. Ultimately, Opposer's evidence falls short of establishing that its pleaded DON Q mark falls on the "very strong" end of the spectrum of fame for likelihood of confusion purposes.

"In view of the extreme deference that is accorded to a famous mark in terms of the wide latitude of legal protection it receives, and the dominant role fame plays in the likelihood of confusion analysis, we think that it is the duty of a plaintiff asserting that its mark is famous to clearly prove it." *Blue Man*

*Productions Inc.,* 75 USPQ2d at 1819. Based on the evidence of record, we find that Opposer's DON Q mark has only achieved a marginal degree of fame for likelihood of confusion purposes. That is, Opposer's DON Q mark has achieved a limited level of recognition amongst consumers of rum. Opposer's mark, however, is nonetheless intrinsically strong inasmuch as it is an arbitrary term in the context of its rum.

The determination of the strength or fame of a mark is not a binary analysis, but rather is the examination of a continuum from the weakest to the most famous. *Joseph Phelps Vineyards, LLC*, 122 USPQ2d at 1734. Based on the totality of the evidence submitted by Opposer which the Board may consider, including the evidence submitted under seal as confidential by both parties, we find that, while Opposer has demonstrated its DON Q mark has achieved commercial success when used in association with rum, Opposer has only shown that its DON Q mark has achieved a marginal degree of fame in the spectrum of fame for purposes of the likelihood of confusion analysis. The fifth *du Pont* factor therefore is neutral.

*Third-Party Marks*

Under the sixth *du Pont* factor, we consider evidence pertaining to the nature and extent of similar marks in use in connection with similar goods. Evidence of widespread use of marks similar to Opposer's on goods similar to Opposer's can affect the scope of protection of Opposer's marks to which they are entitled.

Generally, the probative value of evidence under the sixth *du Pont* factor is limited absent a showing of the nature, extent and scope of such third-party uses and of the public's likely awareness of such uses. *See Han Beauty Inc. v. Alberto-Culver Co.*, 236 F.3d 1333, 57 USPQ2d 1557, 1561 (Fed. Cir. 2001); *Anthony's Pizza & Pasta Int'l Inc. v. Anthony's Pizza Holding Co.*, 95 USPQ2d 1271, 1277-78 (TTAB 2009), *aff'd,* 415 Fed. Appx. 222 (Fed. Cir. 2010). The probative value of such evidence also is limited to the extent that the goods in connection with which the third-party marks are used are not similar to the goods at issue. *See Charrette Corp. v. Bowater Communication Papers Inc.*, 13 USPQ2d 2040, 2043 (TTAB 1989).

Here, Opposer argues that because Applicant has not offered any evidence of third-party use of its DON Q or DONQ COCO marks for rum, the absence of such evidence confirms the conceptual strength of Opposer's marks and undercuts Applicant's claim that consumers will distinguish the marks based on the alleged differences in the goods and services.[54] Opposer further maintains that although Applicant submitted, via notice of reliance, portions of third-party websites that purportedly display use of DON QUIXOTE (spelled with an X or J) and QUIXOTE for alcohol,[55] Applicant did not call third-party witnesses, or inquire from its own witness, to demonstrate that the marks DON QUIXOTE or QUIXOTE are actually in use by any third parties or offer any

[54] Opposer's Trial Brief, p. 40; 84 TTABVUE 48.

[55] *See* Applicant's NOR No. 1; 60 TTABVUE.

evidence that those supposed third parties shorten their use of DON QUIXOTE or QUIXOTE to DON Q or DONQ.[56]

We first note that the evidence of third-party uses submitted by Applicant are not for the marks DON Q or DONQ COCO, but for DON QUIXOTE and QUIXOTE. In light of the absence of any evidence of third-party use of the marks DON Q or DONQ COCO, we find that Opposer's DON Q and DONQ COCO marks used in association with rum are conceptually strong marks. Even if we were to consider Applicant's evidence of third-party use to constitute marks that are used in association with goods similar to those of Opposer, and that consumers would recognize DON Q as a shortened version of DON QUIXOTE, we find that two instances of third-party use of the marks DON QUIXOTE and QUIXOTE do not rise to the level of widespread, significant and unrestrained use by third parties so as to demonstrate that Opposer's DON Q and DONQ COCO marks are weak and should be afforded a narrow scope of protection. The circumstances here also differ from those in *Juice Generation, Inc. v. GS Enterprises LLC*, 794 F.3d 1334, 115 USPQ2d 1671, 1674 (Fed. Cir. 2015), where our reviewing court found that although evidence of the extent of use of third-party uses was not submitted, evidence of third-party use in and of itself was probative in light of the "fair amount" of third-party uses submitted into evidence.

Accordingly, this *du Pont* factor favors Opposer.

---

[56] *Id*. at 40-41; 84 TTABUVE 48-49.

*The Goods and Services*

We next address the *du Pont* likelihood of confusion factor focusing on the comparison of the goods and services identified in Applicant's application vis-à-vis the goods identified in Opposer's pleaded Registration Nos. 1564710 and 4268431, *i.e.*, "rum."[57] *See Stone Lion*, 110 USPQ2d 1157 at 1161; *Octocom Systems, Inc. v. Houston Computers Servs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990); *see also Hewlett-Packard Co. v. Packard Press Inc.*, 281 F.3d 1261, 62 USPQ2d 1001 (Fed. Cir. 2002).

It is settled that it is not necessary that the respective goods and services be identical or even competitive in order to find that they are related for purposes of our likelihood of confusion analysis. The respective goods and services need only be "related in some manner and/or if the circumstances surrounding their marketing [be] such that they could give rise to the mistaken belief that goods [and services] emanate from the same source." *Coach Servs.*, 101 USPQ2d at 1722 (quoting *7-Eleven Inc. v. Wechsler*, 83 USPQ2d 1715, 1724 (TTAB 2007)); *see also In re Martin's Famous Pastry Shoppe, Inc.*, 748 F.2d 1565, 223 USPQ 1289, 1290 (Fed. Cir. 1984); *In re Melville Corp.*, 18 USPQ2d 1386, 1388 (TTAB 1991). Evidence of relatedness may include news articles and/or evidence from computer databases showing that the relevant goods and services are used together or used by the same purchasers; advertisements showing that the

---

[57] We have also considered Opposer's evidence of its common law rights in the mark DON Q for rum.

relevant goods and services are advertised together or offered by the same manufacturer or dealer; and/or copies of prior use-based registrations of the same mark for both Applicant's goods and the goods and services listed in Opposer's registrations. *In re Davia*, 110 USPQ2d 1810, 1817 (TTAB 2014) (finding pepper sauce and agave related where evidence showed both were used for the same purpose in the same recipes and thus consumers were likely to purchase the products at the same time and in the same stores). The issue is not whether purchasers would confuse the goods and services, but rather whether there is a likelihood of confusion as to the source of these goods and services. *L'Oreal S.A. v. Marcon*, 102 USPQ2d 1434, 1439 (TTAB 2012); *In re Rexel Inc.*, 223 USPQ 830, 832 (TTAB 1984).

To demonstrate that its rum is related to the goods and services identified in Applicant's involved application, Opposer made of record a set of approximately 25-30 live (i.e., not canceled) third-party, use-based registrations for each of the opposed classes in Applicant's application, purportedly identifying both Applicant's goods or services in each class and rum or another alcoholic beverage. Although such registrations are not evidence that the marks shown therein are in use or that the public is familiar with them, they nonetheless have some probative value to the extent that they serve to suggest that the goods and services listed therein are of a kind which may emanate from a single source under a single mark. *See In re Albert Trostel & Sons Co.,* 29

USPQ2d at 1785-86; *In re Mucky Duck Mustard Co. Inc.*, 6 USPQ2d 1467 (TTAB 1988).

Additionally, Opposer submitted portions of websites from various spirits distillers, namely, Smirnoff, Bacardi, Jose Cuervo, Captain Morgan, Jack Daniel's, Maker's Mark, Johnnie Walker, Bailey's, Kahlua, Remy Martin, and Ketel One, to demonstrate the similarities of the parties' goods and services and Opposer's natural zone of expansion of use of its DON Q marks and right to "bridge the gap" with products or services for sale allegedly related to Applicant's identified goods and services. Opposer also submitted printouts from webpages of fast casual restaurants, including bakeries and other food establishments to show that these establishments offer both bakery and other food items and alcoholic beverages for sale.

To counter Opposer's evidence, Applicant has submitted numerous probative pairs of live use-based third-party registrations for the same mark owned by different registrants that are used on rum or other distilled spirits on one hand, and food products and/or restaurant services on the other. For example, Applicant submitted, among others, copies of the following registrations: (1) FORTUNA (Reg. No. 4201868) for "rum" and FORTUNA (Reg. No. 4357206) for "candied fruit snacks, nut-based snack foods, sesame oil, quail eggs, powdered milk for food purposes, dairy-based food beverages, fruit-based food beverages" in Class 29 and "rice noodles, food seasonings, chili sauce, edible spices, food package combinations consisting primarily of bread,

crackers, and/or cookies, tapioca flour, flour for food, Asian noodles, grass-based food beverages, herbal tea, grain-based food beverages" in Class 30;[58] (2) VOLCANO (Reg. No. 4908900) for "bread and pastries" and VOLCANO VINEYARDS (Reg. No. 2984033; VINEYARDS disclaimed) for wine;[59] (3) EVOL and design (Reg. No. 4379476) for "alcoholic spirits, namely, distilled spirits" and EVOL (Reg. No. 4081403) for "frozen foods, namely, appetizers consisting primarily of chicken or seafood or beef frozen food" in Class 29 and "frozen foods, namely, grain and bread based appetizers, hors d'oeuvres and canapes" in Class 30;[60] (4) SURGE (Reg. No. 4415745) for "wine" and SURGE (Reg. No. 4857536) for "soft drinks";[61] (5) SUNDANCE (Reg. No. 3798152) for "wines" and SUNDANCE (Reg. No. 4764939) for "non-aloholic beverages containing fruit juices";[62] (6) URBAN BLENDS (Reg. No. 3618680) for "prepared alcoholic cocktail" and URBAN BLENDS (Reg. No. 3851752) for "coffee, tea, chocolate sauces, cocoa powder" in Class 29 and "non-alcoholic drink mixes, namely, smoothie and frappe mixes" in Class 30;[63] (7) SUNRISE (Reg. No. 2134554) for "wine" and SUNRISE (Reg. 4412158) for "edible fats; edible oils; margarine";[64]

---

[58] Applicant's NOR No. 9, 66 TTABVUE.

[59] *Id.*

[60] *Id.*

[61] Applicant's NOR No. 8, 65 TTABVUE.

[62] *Id.*

[63] *Id.*

[64] Applicant's NOR No. 9, 66 TTABVUE.

(8) BAREFOOT BAR (Reg. No. 2404651; BAR disclaimed) for " restaurant and bar services" and BAREFOOT (Reg. No. 2022845) for "wine";[65] (9) EL PATRON RESTAURANT AND CANTINA (Reg. No. 4078519; RESTAURANT AND CANTINA disclaimed) for "bar and restaurant services" and PATRON (Reg. No. 2969941) for "tequila; distilled spirits";[66] and (10) HENDRICK'S (Reg. No. 3641667) for gin and HENDRICK'S BBQ (Reg. No. 4787635) for restaurant and carry out restaurant services.[67] Applicant's evidence does not, however, disprove Opposer's third-party registration evidence that a single entity has registered the same mark for rum on the one hand, and food products, retail store services or the provision of a particular cuisine on the other. It merely reduces the weight to which Opposer's third-party registration evidence is entitled.

Notwithstanding, we note that most of the third-party registrations submitted by Opposer are owned by well-recognized distillers of alcohol, *i.e.*, Maker's Mark, Johnnie Walker, Jose Cuervo, Bacardi, Captain Morgan, Baileys, Kahlua, Jim Beam and Jack Daniels.[68] The fact that distillers of major alcohol brands have lent their well-recognized marks to a wide range of

---

[65] Applicant's NOR No. 6, 75 TTABVUE.

[66] *Id*.

[67] *Id*.

[68] Opposer has conceded that BACARDI, JOSE CUERVO, CAPTAIN MORGAN, JACK DANIEL'S, MAKER'S MARK and KETEL ONE are "well-known spirit brands." *See* Opposer's Reply Brief, pp. 16-17; 92 TTABVUE 21-22.

products does not mean that all of the products they sell are related. We further note that an overwhelming majority of the third-party registrations are for goods and services unrelated to those identified in Applicant's involved application.[69] Accordingly, these particular registrations are entitled to diminished probative value. *Cf. In re Donnay Int'l, S.A.*, 31 USPQ2d 1953, 1954 n.3 (TTAB 1994) ("…since house marks can be used to identify a broad range of products, the inclusion of soccer balls and rackets in the identification is not particularly significant."); *In re Xerox Corp.*, 194 USPQ 449, 450 (TTAB 1977) ("the Examiner's reliance on the registrations of the third parties is not well-founded nor controlling herein if for no other reason than that the marks covered by the registrations are house marks or primary marks which are customarily used to cover all of the different and diverse products and activities undertaken by corporations of the type identified in the registrations whereas here the marks appear to be product marks of limited identification

---

[69] For example, the following non-exhaustive list of live registrations submitted by Opposer identify goods that are not identified in Applicant's involved application: (1) Reg. No. 3804585 for the mark BAILEY'S for "non-diary coffee creamers"; (2) Reg. No. 2983832 for the mark MAKER'S MARK for "fruit preserved in alcohol"; (3) Reg. No. 3504987 for the mark JACK DANIEL'S for "candied nuts"; (4) Reg. No. 4339357 for the mark JOHNNIE WALKER for "chocolate and chocolates"; (5) Reg. No. 1486319 for the mark MAKER'S MARK for "steak sauce"; (6) Reg. No. 2596625 for the mark JOSE CUERVO and design for "salt"; (7) Reg. No. 1699252 for the mark JIM BEAM for "staple foods, namely, steak sauce, pancake syrup and flavored mustard"; (8) Reg. No. 3466371 for the mark CAPTAIN MORGAN for "brewed malt-based alcoholic beverage in the nature of a beer"; (9) Reg. No. 3597906 for the mark JOSE CUERVO MARGARITA MIX for "non-alcoholic margarita mix"; and (10) Reg. No. 2985163 for the mark SMIRNOFF for "flavored malt beverages."

functions.").[70] Similarly, the Internet marketplace evidence derived from the websites of these well-known distillers also has limited probative value for the same reasons.

Moreover, Opposer has not met its burden of showing that a lesser known distiller in a more limited alcoholic beverage field, primarily known for rum, would normally expand its marginally famous name brand to the goods and services identified in Applicant's involved application, or that purchasers would generally expect such goods and services to emanate from the same source. Although well-known distillers may use their brand names on collateral items, the record falls short in disclosing a similar practice relative to lesser-known marks. In particular, Opposer has not submitted any real marketplace evidence to demonstrate that lesser known distillers provide a wide range of food products or offer retail services that provide food products under the same

---

[70] We further note that the third-party registrations submitted by Opposer for the marks DELEGGAND and design (Reg. No. 3315987), KIRKLAND SIGNATURE (Reg. No. 4707076); SMILEY FACE and design (Reg. No. 3502405), TRADER VIC'S (Reg. No. 2552786), and FORTNUM & MASON and design (Reg. No. 3462418) include lengthy "laundry" lists of goods and services and, therefore, have minimal probative value as to the relatedness of the particular goods and services at issue. *See e.g.*, *In re Mucky Duck Mustard Co. Inc.*, 6 USPQ2d at 1470 n.6 (the Board gave little consideration to two third-party registrations owned by "a large department store and an amusement or theme center, respectively, where a wide variety of goods and services are sold"). Additionally, some of the submitted third-party registrations do not include the goods and services at issue, *e.g.*, CARBON (Reg. No. 3890461); HOT-TO-MOLLY and HOT-TO-MOLLY and design (Reg. Nos. 4606543 and 4606544); ROMATE (Reg. No. 3841784); McGARLES IRISH FAMILY BREWERS and design (Reg. No. 4721168); R PRYM and design (Reg. No. 4472211); and SUPER STAR BRAND and design (Reg. No. 3066346). Accordingly, these registrations have no probative value regarding the relatedness of the goods and services at issue. *In re W.W. Henry Co.*, 82 USPQ2d 1213, 1215 (TTAB 2007).

mark. Furthermore, the remaining third-party registrations submitted by Opposer that are not owned by well-recognized spirits distillers are insufficient to show that spirits brands sell food products or operate retail store services under the same trademark, particularly in light of the countervailing third-party registration evidence submitted by Applicant. Opposer only submitted the following probative third-party registrations owned by lesser known distillers identifying both alcoholic beverages and goods and services identical and/or similar to those identified in Classes 29, 30, 32 and 35 of Applicant's involved application:

Classes 29 and 33[71]

| Reg. No. | Mark | Goods |
| --- | --- | --- |
| 3762133 | Asahi | "Milk based beverages containing coffee or tea" in Class 29 and "Western liquors, namely, liqueurs, alcoholic beverages of fruit" in Class 33. |
| 2944764 | BING HAN 炳 翰 | "Milk powder, milk, bean curd, cooking animal oils, cooking vegetable oils, fruit jellies, fruit jellies powder, meats, meat products, namely, luncheon meat and bologna, marine products, namely, seafood, processed marine products, namely, tuna and crabmeat, eggs, essence of chicken" in Class 29 and "Alcoholic drinks, namely, champagne, brandy, whiskey, vodka, fruit liquors, refined sake, sorghum liquors, wu chia |

---

[71] Opposer also submitted Registration No. 3288302 for the mark BONOLLO DISTILLERIE BONOLLO S.P.A. CASA FONDATA NEL 1998 and design to demonstrate the relatedness of its rum and Applicant's Class 29 goods. However, the Class 29 goods in this registration have been deleted and, therefore, this registration has no probative value in demonstrating the relatedness of Opposer's rum and Applicant's identified Class 29 goods.

| Reg. No. | Mark | Goods |
|---|---|---|
| | | pi liquors, mao tai liquors, rum, absinth, ginseng liquors, rice liquors, aperitif, pear liquors, cyder, plum liquors, distilled liquors, and snake liquors" in Class 33. |
| 3209611 | MORGENSTER | "Olive oil; olive paste; processed olive puree; preserved, dried, cooked and processed olives" in Class 29 and "Wines, liqueurs, ports, distilled spirits, rum, tequila, brandy, vodka, cognac, gin, cordials, bourbon, whisky, aperitifs with a distilled alcoholic base, aperitifs with a wine base, alcoholic beverages containing fruit, alcoholic beverages containing fruit extracts, and prepared alcoholic cocktails" in Class 33. |
| 3499189 | TERANA | "Unflavored and unsweetened gelatin; canned food, namely, jalapenos, vegetables, meat, fish, and poultry; meat extract; canned, dried, and cooked fruits and vegetables; marmalades, compotes, eggs, milk and lactic acid drinks, edible oils and fats" in Class 29 and "alcoholic beverages, namely, tequila, rum, vodka and whiskey excluding wine" in Class 33. |

Classes 30 and 33[72]

| Reg. No. | Mark | Goods |
|---|---|---|
| 3762133 | Asahi | "Coffee; tea of parched powder of barley with husk (mugi-cha), Japanese green tea; cocoa; coffee or tea based beverages containing milk" in Class 30 and "Western liquors, namely, liqueurs, alcoholic beverages of fruit" in Class 33. |

[72] Reg. Nos. 3841784 and 3528428 for the marks ST. NICHOLAS ABBEY and ST. NICHOLAS ABBEY and design, respectively, are owned by the same registrant.

| 2944764 | | "Tea leaves; tea; coffee; cocoa; chocolate; drinks made from tea leaves, coffee, cocoa, and chocolate; ice; ice products, namely, flavored ices and ice cubes; seasoning ingredients in general type; sugar; honey; bread; toast; puddings; glutinous rice cake; processed grain powder, namely, rice mix and flour mix; noodles; quickly cooking noodles; processed grain deserts, namely, rice cakes; dumplings; rice; and cooked rice" in Class 30 and "Alcoholic drinks, namely, champagne, brandy, whiskey, vodka, fruit liquors, refined sake, sorghum liquors, wu chia pi liquors, mao tai liquors, rum, absinth, ginseng liquors, rice liquors, aperitif, pear liquors, cyder, plum liquors, distilled liquors, and snake liquors" in Class 33. |
|---|---|---|
| 3499189 | TERANA | "Spices, processed cereals, coffee, tea, cocoa, sugar, rice, tapioca, sage, coffee substitutes, bread, bakery products, pastry, edible ice cream, honey, molasses syrup, yeast, baking powders, salt, mustard, vinegar, seasoned sauces, salsa, and ice; flour and processed cereal preparations, namely, breakfast cereals, cereal based snack food, ready-to-eat cereals and flour-based chips" in Class 30 and "alcoholic beverages, namely, tequila, rum, vodka and whiskey excluding wine" in Class 33. |
| 3414749 | | "Coffee, coffee-based beverages, unroasted coffee, tea, cocoa, sugar, rice, tapioca, sago, artificial coffee; flour; preparations made from cereals, namely bread and pastry; confectionery made from cereals, namely pastilles; ice cream, iced tea, edible ices, namely fruit ices, flavored ices, ice cream drinks, ice cream cakes; honey, golden syrup, namely table syrup, corn syrup, chocolate syrup, coffee flavored syrup used in making food beverages, |

| | | |
|---|---|---|
| | | flavoring syrup, maple syrup, pan cake syrup; yeast, baking-powder, salt, mustard, vinegar, salad dressings; condiment sauces; spices; ice for refreshment; ice; pasta; pizzas" in Class 30 and "Alcoholic beverages, namely alcoholic beverages of fruit, alcoholic coffee based beverages, alcoholic tea based beverage, flavored brew malt beverages, rum; wine, distilled spirits" in Class 33. |
| 3315987 | DON GUILLERMO | "Coffee" in Class 30 and "Rum" in Class 33. |
| 3071447 | GOLDEN ROSE | "Herbal tea and candies," among other things in Class 30 and "Distilled spirits made of rice, peas or sorghum, herb liquors, port wine, rum, sake, fruit wine, red wine, white wine and cooking wine" in Class 33. |
| 3925383 | HILLBILLY HAMMER | "Sandwiches; Sandwiches, namely, bratwurst" in Class 30 and "Alcoholic beverages except beers; Alcoholic beverages, namely, beverages containing rum and bourbon; Bourbon; Prepared alcoholic cocktail; Rum; Spirits" in Class 33. |
| 3350433 | ST. NICHOLAS ABBEY | "Molasses; Sugar; Table syrup" in Class 30 and "Rum" in Class 33. |
| 3528428 | St. Nicholas Abbey BARBADOS · WEST INDIES | "Molasses; Sugar; Table syrup" in Class 30 and "Rum" in Class 33. |
| 3270757 | TORTUGA | "Cakes, namely, rum cakes" in Class 30 and "Rum" in Class 33. |
| 4522852 | 釣魚臺 | "Coffee; tea, tea substitute; sugar; non-medical nutritional substances, namely, honey and royal jelly for food purposes; instant rice; pastries; rice; flour; milled flour products, namely, noodles; puffed food, namely, popcorn; food starch, starch products for food, namely, potato flour; condiments, namely, salt, soy sauce, vinegar, mustard, monosodium glutamate, sauces; yeast; aromatic |

| Reg. No. | Mark | Goods |
|---|---|---|
| | | preparations for food, namely, seasonings; meat tenderizers for household purposes" in Class 30 and "Alcoholic beverages, namely, potable spirits, liqueur, brandy, vodka, sake, wine, whisky, rum, prepared alcoholic cocktails, hard cider, champagne, sherry, gin" in Class 33. |
| 4778964 | BARCADE | "Burgers contained in bread rolls; sandwiches; wrap sandwiches" in Class 30 and "Alcoholic drinks, namely, vodka, tequila, rum, whiskey, scotch, gin, mixed alcoholic drinks, spirit-based alcoholic drinks; alcoholic fruit cocktail drinks; alcoholic beverages except beers" in Class 33. |

Classes 32[73] and 33

| Reg. No. | Mark | Goods |
|---|---|---|
| 3762133 | Asahi | "Beer; mineral and aerated waters; carbonated drinks; fruit juices" in Class 32 and "Western liquors, namely, liqueurs, alcoholic beverages of fruit" in Class 33. |

---

[73] Opposer has submitted evidence consisting of news articles highlighting alcoholic cocktail recipes that feature Opposer's DON Q rum purportedly for the purpose of demonstrating that rum and fruit juices or other non-alcoholic beverages are complementary goods. *See* Exh. 24 of Serralles Testimony Dep., 58 TTABVUE 637-1202. However, this evidence falls short since "there is no *per se* rule that all food products appearing in the same recipe be considered related for Section 2(d) purposes. It is not unusual for recipes to contain many different ingredients and consumers are not likely to assume merely from the fact that two items are called for in the same recipe that they necessarily emanate from the same source of origin." *In re Davia*, 110 USPQ2d at 1816. Moreover, Opposer has not submitted any marketplace evidence (aside from marketplace evidence of the well-known distillers which we have accorded limited probative weight) that rum and fruit juices and/or other non-alcoholic beverages are sold in the same stores to the same consumers for the same, related or complementary use so that consumers are likely to be confused upon encountering the goods under the same or similar mark.

| 2944764 | | "Beer; soda water; fruit juice; mineral water; and sports drinks cola" in Class 32 and "Alcoholic drinks, namely, champagne, brandy, whiskey, vodka, fruit liquors, refined sake, sorghum liquors, wu chia pi liquors, mao tai liquors, rum, absinth, ginseng liquors, rice liquors, aperitif, pear liquors, cyder, plum liquors, distilled liquors, and snake liquors" in Class 33. |
|---|---|---|
| 3651220 | | "Beers; mineral and aerated waters and other non-alcoholic drinks, namely, colas, non-alcoholic cocktails, lemonades, fruit drinks and fruit juices; syrups and other preparations for making beverages, namely, fruit drinks, fruit juices and fruit beverages, namely, fruit sodas" in Class 32 and "Alcoholic beverages, except beers, namely, liqueurs, rum, brandy, vodka, gin, and tequila" in Class 33. |
| 3414749 | | "Beers, mineral and aerated waters; non-alcoholic drinks, namely coffee flavored soft drinks, energy drinks, soft drinks flavored with tea, apple juice beverages, frozen fruit beverages, iced fruit beverages, orange juice beverages, pine apple juice beverages, tomato juice, vegetable juice; fruit drinks and fruit juices; syrups for making beverages; preparations for making fruit drinks, and soft drinks" in Class 32 and "Alcoholic beverages, namely alcoholic beverages of fruit, alcoholic coffee based beverages, alcoholic tea based beverage, flavored brew malt beverages, rum; wine, distilled spirits" in Class 33. |
| 4301733 | MALT LIFE | "Beers, mineral and aerated waters; fruit drinks and fruit juices; syrups for making beverages" in Class 32 and "alcoholic beverages, not including beer, namely, whiskey, rum, scotch, bourbon, vodka, cordials, gin, brandy, |

| | | cognac, liquors, and liqueurs" in Class 33. |
|---|---|---|
| 3324782 | MARASKA | "Beers; mineral and aerated waters and other non-alcoholic drinks, namely, non-alcoholic fruit juice beverages, isotonic beverages, lemonades; fruit drinks and fruit juices; syrups and other preparations for making beverages, namely syrups for lemonades" in Class 32 and "Alcoholic beverages except beers, namely, wine, gin, liqueurs made from maraska cherries, distilled spirits, rum, schnapps" in Class 33. |

Class 33 and Class 35

| Reg. No. | Mark | Goods/Services |
|---|---|---|
| 3275431 | GEROVASSILIOU | Alcoholic beverages not including beer, namely, port wine and wine-based aperitifs" in Class 33 and "retail and wholesale store services featuring beverages, alcoholic and non-alcoholic beverages, wines and spirits" in Class 35. |

Thus, consumers are not likely to perceive a common source between distillers of rum with limited fame and food products in general or retail services featuring the goods identified in Applicant's involved application. To allow Opposer or other lesser-known alcoholic beverage distillers to reserve their marks for a wide range of goods and services would be tantamount to a grant of a right in gross to the mark.

Accordingly, we find that Opposer has failed to establish that its rum is related to Applicant's food products identified in Classes 29, 30, and 32. We

additionally find that Opposer has also failed to demonstrate that rum is related to Applicant's Class 35 retail services.

This *du Pont* factor therefore does not weigh in favor of finding that there is likely confusion between (1) Opposer's rum and Applicant's Class 29, 30, and 32 food and non-alcoholic beverage products; and (2) Opposer's rum and Applicant's Class 35 retail store services.

With regard to our analysis as to whether Opposer's rum and Applicant's Class 42 services, as amended by this decision, *i.e.*, "providing European cuisine; providing tea, coffee, cocoa, carbonated beverages or fruit juices beverages; providing Japanese cuisine" are related goods and services, we note that Opposer is required to show "something more" than that similar marks are used for spirits and for restaurant services or the provision of a particular cuisine, including the offering of non-alcoholic beverages. *In re Coors Brewing Co.,* 343 F.3d 1340, 68 USPQ2d 1059, 1063 (Fed. Cir. 2003) (quoting *Jacobs v. Int'l Multifoods Corp.*, 668 F.2d 1234, 212 USPQ 641, 642 (CCPA 1982); *see also In re Accelerate s.a.l.,* 101 USPQ2d 2047, 2050 (TTAB 2012); *In re Giovanni Food Co.*, 97 USPQ2d 1990, 1992 (TTAB 2011).

In *Coors Brewing,* the Court of Appeals for the Federal Circuit explained why more evidence than just showing restaurants sell beer is required to prove that those beer and restaurant services are related:

> It is not unusual for restaurants to be identified with particular food or beverage items that are produced by the same entity that provides the restaurant services or are sold by the same entity under a

> private label. Thus, for example, some restaurants sell their own private label ice cream, while others sell their own private label coffee. But that does not mean that any time a brand of ice cream or coffee has a trademark that is similar to the registered trademark of some restaurant, consumers are likely to assume that the coffee or ice cream is associated with that restaurant. The *Jacobs* case [*Jacobs v. International Multifoods Corp.*, 668 F.2d 1234, 212 USPQ 641 (CCPA 1982)] stands for the contrary proposition, and in light of the very large number of restaurants in this country and the great variety in the names associated with those restaurants, the potential consequences of adopting such a principle would be to limit dramatically the number of marks that could be used by producers of foods and beverages.

*Coors Brewing,* 68 USPQ2d at 1063. In other words, there is no *per se* rule that certain goods and services are related. *Lloyd's Food Products, Inc. v. Eli's, Inc.*, 987 F.2d 766, 25 USPQ2d 2027 (Fed. Cir. 1993) (no *per se* rule about confusion, where similar marks are used in connection with restaurant services and food products). This decision of the Federal Circuit recognizes that the diversity and expansion of businesses in a modern, dynamic and evolving economy is not, in and of itself, sufficient to support an inference that purchasers are apt to believe that disparate products or services emanate from the same source. *See also In re American Olean Tile Co.,* 1 USPQ2d 1823, 1826 (TTAB 1986). The Board, however, has found the "something more" requirement to be met under the following circumstances:

> Applicant's mark made clear that its restaurant specialized in registrant's type of goods. *See In re Golden Griddle Pancake House Ltd.,* 17 USPQ2d 1074 (TTAB 1990) (GOLDEN GRIDDLE PANCAKE HOUSE for restaurant services confusingly similar to GOLDEN GRIDDLE for table syrup); *In re Azteca Restaurant*

> *Enterprises, Inc.,* 50 USPQ2d 1209 (TTAB 1999) (AZTECA MEXICAN RESTAURANT for restaurant services confusingly similar to AZTECA for Mexican food items); and
>
> The record showed that registrant's wines were actually sold in applicant's restaurant. *See In re Opus One Inc.*, 60 USPQ2d 1812, 1815 (TTAB 2001) ("the record in this case reveals that registrant's OPUS ONE wine is offered and served by applicant at its OPUS ONE restaurant.").

We now consider whether the record includes evidence sufficient to meet the "something more" requirement.

As with the third-party registrations submitted to demonstrate that Opposer's rum is related to the Class 29, 30, 33, and 35 goods and services identified in Applicant's involved application, most of the third-party registrations submitted to show that Opposer's rum is related to restaurant services or the service of providing food and beverages are owned by well-recognized distillers of alcohol, i.e., JACK DANIEL'S, MAKER'S MARK, ABSOLUT, SKYY, KETEL ONE, CAPTAIN MORGAN and BACARDI. As explained above, these third-party registrations, as well as the corresponding marketplace Internet evidence concerning these same entities, have limited probative value. Moreover, Opposer's submission of printouts from webpages of fast casual restaurants, including bakeries and other food establishments that purportedly show that these establishments offer both bakery and other food items and alcohol for sale, have no probative value regarding the relatedness of Opposer's rum and Applicant's Class 43 services since these websites do not show the same mark serving as a source indicator for both the casual food eatery and the alcohol served at such dining establishments. Finally, the

remaining seven third-party registrations submitted by Opposer which do have probative value, two of which are owned by the same registrant, are insufficient to demonstrate that rum and restaurant services or the provision of food and beverages are related goods and services.

Based on the evidence of record, we find that the requirement to show "something more" has not been met. In light of the large number of restaurants and providers of various cuisines in the United States, the fact that a single mark is occasionally used to identify restaurant services and rum or another alcoholic beverage, or the fact that restaurants may serve rum, is not sufficient to establish a relationship between restaurant services or the provision of a particular cuisine in general and rum. *See In re Giovanni Food Co.,* 97 USPQ2d at 1992 (JUMPIN' JACKS for "barbeque sauce" is not likely to cause confusion with JUMPIN JACK'S for "coffee-house services; and catering services" because the "something more" requirement has not been met); *compare In re Accelerate s.a.l.*, 101 USPQ2d at 2050-51 (COLUMIANO COFFEE HOUSE for "providing food and drink" is confusingly similar to COLUMBIAN for "coffee").

This *du Pont* factor weighs against finding that there is a likelihood of confusion between Applicant's Class 43 services, as amended, and Opposer's rum.

*Trade Channels*

Next we consider the similarity or dissimilarity of established, likely to continue trade channels under the third *du Pont* factor. In an *inter partes*

proceeding before the Board, the issue of likelihood of confusion must be determined based on the goods and services recited in Applicant's application vis-à-vis the goods identified in Opposer's pleaded registrations. *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1846 (Fed. Cir. 2000); *Canadian Imperial Bank v. Wells Fargo Bank*, 811 F.2d 1490, 1 USPQ2d 1813 (Fed. Cir. 1992). Because the identifications of goods and services in the involved application and registrations are unrestricted as to trade channels, we must presume that Applicant's goods and services and Opposer's rum travel in all normal channels of trade and distribution channels for such goods and services and will be marketed to the same potential consumers. *See Packard Press, Inc. v. Hewlett-Packard Co.*, 227 F.3d 1352, 56 USPQ 1351, 1354 (Fed. Cir. 2000) ("When the registration does not contain limitations describing a particular channel of trade or class of customer, the goods or services are assumed to travel in all normal channels of trade."); *see also In re Elbaum*, 211 USPQ 639, 640 (TTAB 1981), citing *Kalart Co., Inc. v. Camera-Mart, Inc.*, 258 F.2d 956, 119 USPQ 139 (CCPA 1958).

The ordinary trade and distribution channels for Opposer's rum are wholesalers, bars and restaurants, as well as retail liquor stores. The ordinary trade channels for Applicant's Class 29, 30, and 32 food products are retail store outlets, grocery and convenience stores. The evidence of record shows that food and alcohol may both be served at bars, restaurants and other types of dining establishments, *see* Opposer's NOR. No. 7 (42 TTABVUE). The record, however,

does not demonstrate that Opposer's rum and Applicant's Class 35 wholesale and retail store services featuring food, non-alcoholic beverages, cleaning tools and washing utensils, and various tools travel in the same channels of trade. As such, the trade channels for Opposer's rum and Applicant's identified goods and Class 43 services, i.e., the provision of various ethnic cuisines, slightly overlap. Hence, to the extent the trade channels of Opposer's rum and Applicant's goods and Class 43 services overlap, we find this factor to weigh slightly in favor of Opposer.

*Purchasers and Conditions of Sale*

Next we consider the conditions under which the goods and services are likely to be purchased, e.g., whether on impulse or after careful consideration, as well as the degree, if any, of sophistication of the consumers. *du Pont*, 177 USPQ at 567. Purchaser sophistication may tend to minimize likelihood of confusion. Conversely, impulse purchases of inexpensive items may tend to have the opposite effect. *Palm Bay Imports*, 73 USPQ2d at 1695.

Applicant argues that while the purchasers of the goods and services at issue need not be particularly sophisticated, they are nonetheless sophisticated enough to distinguish between alcoholic beverages and non-alcoholic goods and services, especially given the government restrictions on the purchase of alcohol.[74] Applicant has provided no evidence to support its assertions. As noted above, our determination under Section 2(d) is based on the probative facts in

---

[74] Applicant's Trial Brief, p. 51, 88 TTABVUE 55.

evidence. *du Pont,* 177 USPQ at 567. Further, even assuming that purchasers of either Opposer's goods or Applicant's goods and services are sophisticated, when it comes to their buying decisions, it is settled that even sophisticated purchasers are not immune from source confusion. *See Stone Lion,* 110 USPQ2d at 1163.

We further note that neither Opposer's rum nor Applicant's goods and services are restricted to any particular price point or consumer. When the goods and services are unrestricted, it is assumed that they are sold to all purchasers, including those purchasers exercising only ordinary care, and at all price points. *Recot Inc. v. M.C. Becton*, 214 F.3d 1322, 54 USPQ2d 1894 (Fed. Cir. 2000). The record shows that Opposer's and Applicant's goods and services are relatively inexpensive. For example, Applicant' trial witness, Mr. Yamagishi, testified that the average cost for small breads and coffee at Applicant's planned U.S. locations will be in the $ 2 range.[75] Moreover, there is no evidence in the record that Applicant's unrestricted retail services under Class 35 would be sophisticated transactions where consumers would exercise special care in purchasing. In similar cases, the Board has found that similar wholesale and retail store services selling various goods are not sophisticated transactions. *Starbucks U.S. Brands, LLC and Starbucks Corporation d.b.a. Starbucks Coffee Company v. Marshall Ruben*, 78 USPQ2d 1741, 1752 (TTAB 2006) (Applicant's Class 43 retail services featuring beverages (coffee and tea)

---

[75] Yamagishi Testimony, p. 90; 80 TTABVUE 115.

and its Class 30 beverages (coffee and tea) [are inexpensive products and may be purchased on impulse and without care, which means "consumers devote limited attention to the purchase of such goods and services, and thus are more susceptible to confusion"). Similarly, there is no evidence that Applicant's proposed services in Class 43 are sophisticated transactions that would increase the degree of care that consumers make when purchasing. *In re Opus One Inc.*, 60 USPQ2d 1812, 1817 (TTAB 2001) (wine/restaurant services not sophisticated).

"When products [and services] are relatively low-priced and subject to impulse buying, the risk of likelihood of confusion is increased because purchasers of such products are held to a lesser standard of purchasing care." *Recot Inc.*, 54 USPQ2d at 1899. We therefore find that the fourth *du Pont* factor is neutral.

*Bad Faith Adoption*

Opposer asserts Applicant sought registration in bad faith but bases this contention only on Applicant's admission that it was aware of Opposer's pleaded marks prior to filing its U.S. application.[76] Bad faith, or intent to confuse, falls under the thirteenth *du Pont* factor "any other established fact probative of the effect of use." *L.C. Licensing Inc. v. Berman*, 86 USPQ2d 1883, 1890 (TTAB 2008) ("[A] party which knowingly adopts a mark similar to one used by another

---

[76] Opposer's NOR No. 10 (Applicant's Response to Interrogatory No. 10), 44 TTABVUE 29.

for related goods should not be surprised to find scrutiny of the filer's motive."); *L'Oreal S.A. and L'Oreal USA, Inc. v. Robert Victor Marcon*, 102 USPQ2d 1434, 1442 (TTAB 2012). "[W]hen there is evidence of an applicant's intent to adopt a mark that suggests to purchasers a successful mark already in use by another, the Board may, and ought to, take into account that intent when resolving the issue of likelihood of confusion when that issue is not free from doubt." *First Int'l Services Corp. v. Chuckles Inc.*, 5 USPQ2d 1628, 1633 (TTAB 1988). However, "an inference of 'bad faith' requires something more than mere knowledge of a prior similar mark." *Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 4 USPQ2d 1793, 1798 (Fed. Cir. 1987). A finding of bad faith must be supported by evidence of an intent to confuse, rather than mere knowledge of another's mark or even an intent to copy. *See, e.g., Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 92 USPQ2d 1769, 1782 (2d Cir. 2009) ("[T]he 'only relevant intent is intent to confuse. There is a considerable difference between an intent to copy and an intent to deceive.'" (quoting 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:113)).

Inasmuch as the only evidence here merely pertains to Applicant's prior knowledge and not to Applicant's intent, we find this factor to be neutral.

*Absence of Actual Confusion*

It is well established that evidence of actual confusion is not necessary to show a likelihood of confusion. *Weiss Assocs., Inc. v. HRL Assocs., Inc.*, 902 F.2d

1546, 14 USPQ2d 1840, 1842 (Fed. Cir. 1990). In this case, the record is devoid of any instances of actual confusion. However, the lack of actual confusion is immaterial since Applicant's involved application was filed under Section 66(a) with an allegation of a bona fide intention to use the mark in commerce. Additionally, Applicant has admitted that it has not used or advertised planned use of its involved DONQ mark in the United States.[77] Thus, there has been no opportunity for actual confusion to arise. *Andre Oliver, Inc. v. Products Exchange Co.*, 1 USPQ2d 1817, 1820 (TTAB 1986). Accordingly, this *du Pont* factor is neutral.

*Remaining du Pont Factors*

The parties have not put forward any evidence or argument regarding any of the remaining *du Pont* factors. The Board need not consider factors that are not of record before the Board. *See M2 Software, Inc. v. M2 Commc'ns, Inc.*, 450 F.3d 1378, 78 USPQ2d 1944, 1947 (Fed. Cir. 2006).

*Balancing the du Pont Factors*

Based on all evidence and arguments bearing on the *du Pont* factors that the Board may consider, including the evidence and arguments that we have not specifically discussed herein, we conclude that although Opposer has established that its pleaded DON Q mark has achieved a marginal degree of fame for likelihood of confusion purposes, at least insofar as it relates to rum,

---

[77] Opposer's NOR No. 10 (Applicant's Response to Opposer's Interr. Nos. 4, 8); 44 TTABVUE 24, 27-8.

its "fame" is insufficient in and of itself to establish a likelihood of confusion under Section 2(d) of the Trademark Act.[78] *Recot Inc. v. M.C. Becton*, 214 F.3d 1322, 54 USPQ2d 1894, 1898 (Fed. Cir. 2000) ("fame alone cannot overwhelm the other *DuPont* factors as a matter of law."). Moreover, when considered in their entireties, Opposer's DON Q and DONQ COCO marks and Applicant's DONQ mark are similar in appearance, sound, meaning and commercial impression. However, we find that Opposer's failure to establish that its rum is sufficiently related to any of the opposed classes of goods and services identified in Applicant's application outweighs the similarities of the marks and marginal fame of Opposer's mark. The remaining *du Pont* factors discussed are neutral or slightly favor Opposer.

Accordingly, since Opposer has not demonstrated that its rum and the opposed goods and services are related for likelihood of confusion purposes, we find that Opposer has failed to prove its Section 2(d) claim by a preponderance of the evidence. *Kellogg Co. v. Pack'em Enterprises Inc.*, 951 F.2d 330, 21 USPQ2d 1142, 1145 (Fed. Cir. 1991) (single *du Pont* factor may be dispositive).

## VI.    Dilution Claim

Turning finally to Opposer's claim of dilution, an essential element for proving dilution is proving fame, and fame for dilution purposes requires a more

---

[78] We note that since Opposer did not submit any evidence regarding the fame of its pleaded DONQ COCO mark, Opposer has failed to establish that this pleaded mark is famous for likelihood of confusion purposes.

stringent showing than fame for likelihood of confusion purposes. 15 U.S.C. §1125(c)(2)(A); *Palm Bay Imps.,* 73 USPQ2d at 1694.

Because, as discussed above, Opposer has only shown on this record that its DON Q mark has achieved a limited degree of fame for purposes of likelihood of confusion, it follows that Opposer has not shown the requisite level of fame for purposes of dilution.[79] Therefore, Opposer has failed to prove its dilution by blurring claim by a preponderance of the evidence.

**Decision**: Judgment is entered against Applicant with regard to the deleted Class 43 services, i.e., "providing alcoholic beverages." The opposition is dismissed, however, as to both Opposer's likelihood of confusion claim and claim of dilution by blurring as they relate to the remaining goods and services identified in Applicant's involved application.

---

[79] In any event, following careful consideration of all the evidence of fame of record, including evidence submitted under seal as confidential, we find that Opposer has failed to demonstrate that its pleaded DON Q is famous for dilution purposes which requires fame amongst the general public. Similarly, since Opposer failed to submit any evidence regarding the asserted fame of its pleaded DONQ COCO mark, Opposer has also not shown that this pleaded mark is famous for purposes of dilution.